**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
Department of Justice, Antitrust Division
450 5th Street, N.W., Suite 7000
Washington, D.C.  20530

STATE OF NEW YORK,
Office of the Attorney General
120 Broadway, 26th Floor
New York, NY 10271-0332

STATE OF WASHINGTON,
Office of the Attorney General
800 Fifth Avenue, S. 2000
Seattle, WA 98104

STATE OF CALIFORNIA,
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

STATE OF ILLINOIS,
Office of the Attorney General
100 W. Randolph Street
Chicago, IL 60601

COMMONWEALTH OF MASSACHUSETTS,
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

STATE OF OHIO,
Office of the Attorney General
150 E. Gay Street, 23rd Floor
Columbus, OH 43215

and

COMMONWEALTH OF PENNSYLVANIA,
Office of the Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120

*Plaintiffs*,

Civil Action No. 11-01560 (ESH)

v.

AT&T INC.,
One AT&T Plaza
208 South Akard Street
Dallas, Texas  75202

T-MOBILE USA, INC.,
12920 SE 38th Street
Bellevue, Washington  98006

and

DEUTSCHE TELEKOM AG,
Friedrich-Ebert-Allee
Bonn, Germany D-53113

*Defendants.*

## AMENDED COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the States of New York, Washington, California, Illinois, and Ohio and the

Commonwealths of Massachusetts and Pennsylvania, acting under the direction of their

respective Attorneys General and other authorized officials ("Plaintiff States") (collectively,

"Plaintiffs"), bring this civil action to enjoin the merger of two of the nation's four largest mobile

wireless telecommunications services providers, AT&T Inc. ("AT&T") and T-Mobile USA, Inc.

("T-Mobile"), and to obtain equitable and other relief as appropriate.  Plaintiffs allege as follows:

## I.  NATURE OF THE ACTION

1.     Mobile wireless telecommunications services are vital to the everyday lives of

hundreds of millions of Americans.  From their modest beginnings in the 1980s, when handsets

were the size of a brick and coverage areas were limited, mobile wireless telecommunications

devices have evolved into a profusion of smartphones, feature phones, tablets, data cards, e-readers, and other devices that use the nationwide mobile wireless telecommunications networks. Mobile wireless telecommunications services have become indispensable both to the way we live and to the way companies do business throughout the United States. Innovation in wireless technology drives innovation throughout our 21st-century information economy, helping to increase productivity, create jobs, and improve our daily lives. Vigorous competition is essential to ensuring continued innovation and maintaining low prices.

2.      On March 20, 2011, AT&T entered into a stock purchase agreement to acquire T-Mobile from its parent, Deutsche Telekom AG ("DT"), and to combine the two companies' mobile wireless telecommunications services businesses ("Transaction Agreement"). AT&T, with approximately 98.6 million connections to mobile wireless devices, and T-Mobile, with approximately 33.6 million connections, serve customers throughout the United States, with networks that each reach the homes of at least 90 percent of the U.S. population. AT&T and T-Mobile are two of only four mobile wireless providers with nationwide networks and a variety of competitive attributes associated with that national scale and presence. The other two nationwide networks are operated by Verizon Wireless ("Verizon") and Sprint Nextel Corp. ("Sprint"). Although smaller providers exist, they are significantly different from these four. For instance, none of the smaller carriers' voice networks cover even one-third of the U.S. population, and the largest of these smaller carriers has less than one-third the number of wireless connections as T-Mobile. Similarly, regional competitors often lack a nationwide data network, nationally recognized brands, significant nationwide spectrum holdings, and timely access to the most popular handsets. Collectively, the "Big Four" – AT&T, T-Mobile, Verizon,

3

and Sprint – provide more than 90 percent of service connections to U.S. mobile wireless devices.

3.      Due to the advantages arising from their scale and scope of coverage, each of the Big Four nationwide carriers is especially well-positioned to drive competition, at both a national and local level, in this industry.  T-Mobile in particular – a company with a self-described "challenger brand," that historically has been a value provider, and that even within the past few months had been developing and deploying "disruptive pricing" plans – places important competitive pressure on its three larger rivals, particularly in terms of pricing, a critically important aspect of competition.  AT&T's elimination of T-Mobile as an independent, low-priced rival would remove a significant competitive force from the market.  Additionally, T-Mobile's investment in an advanced high-speed network and its innovations in technology and mobile wireless telecommunications services have provided, and continue to provide, consumers with significant value.  Thus, unless this acquisition is enjoined, customers of mobile wireless telecommunications services likely will face higher prices, less product variety and innovation, and poorer quality services due to reduced incentives to invest than would exist absent the merger.  Because AT&T's acquisition of T-Mobile likely would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, the Court should permanently enjoin this acquisition.

## II.  JURISDICTION AND VENUE

4.      The United States files this Complaint under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The Plaintiff States, by and through their respective Attorneys

General and other authorized officials, bring this action under Section 16 of the Clayton Act,

15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act,

15 U.S.C. § 18.  The Plaintiff States bring this action in their sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economy of each of their states.

5.      AT&T, DT, and T-Mobile are engaged in interstate commerce and in activities substantially affecting interstate commerce and commerce in each of the Plaintiff States.  The Court has subject-matter jurisdiction over this action pursuant to Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 25 and 26, and 28 U.S.C. §§ 1331, 1337, 1345.

6.      Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1), (c).  Defendants AT&T, DT, and T-Mobile transact business and are found within the District of Columbia.  The Defendants have consented to personal jurisdiction in this judicial district.

## III.  THE DEFENDANTS AND THE TRANSACTION

7.      AT&T, with headquarters in Dallas, Texas, is a corporation organized and existing under the laws of the State of Delaware.  AT&T is one of the world's largest providers of communications services, and the second-largest mobile wireless telecommunications services provider in the United States, as measured by subscribers.  AT&T provides mobile wireless telecommunications services in 50 states, the District of Columbia, and Puerto Rico, providing approximately 98.6 million connections to mobile wireless devices.  In 2010, AT&T's revenues from mobile wireless telecommunications services were $53.5 billion, and its total revenues were more than $124 billion.

8.      T-Mobile, with headquarters in Bellevue, Washington, is a corporation organized and existing under the laws of the State of Delaware.  T-Mobile is the fourth-largest mobile wireless telecommunications services provider in the United States as measured by subscribers. T-Mobile provides mobile wireless telecommunications services in 48 states, the District of Columbia, and Puerto Rico, providing approximately 33.6 million connections to mobile wireless devices.  In 2010, T-Mobile's revenues from mobile wireless telecommunications services were approximately $18.7 billion.  T-Mobile is a wholly owned subsidiary of Deutsche Telekom AG.

9.      Deutsche Telekom AG is a German corporation headquartered in Bonn, Germany. It is the largest telecommunications operator in Europe with wireline and wireless interests in numerous countries and total annual revenues in 2010 of €62.4 billion.

10.      Pursuant to the Transaction Agreement, AT&T will acquire T-Mobile for cash and stock worth approximately $39 billion.  If this transaction is consummated, AT&T and T-Mobile would become the nation's largest wireless carrier.  The merged firm would have approximately 132 million connections to mobile wireless devices in the United States, with more than $72 billion in mobile wireless telecommunications services revenues.

## IV.  TRADE AND COMMERCE

### A.      Relevant Product Markets

11.      Mobile wireless telecommunications services allow customers to engage in telephone conversations and obtain data services using radio transmissions without being confined to a small area during a call or data session, and without requiring an unobstructed line of sight to a radio tower.  Mobility is highly valued by customers, as demonstrated by the more

than 300 million connections to mobile wireless devices in the United States.  In 2010, revenues from the sale of mobile wireless telecommunications services in the United States were approximately $160 billion.  To provide service, mobile wireless telecommunications carriers typically must acquire FCC licenses to utilize electromagnetic spectrum to transmit signals; deploy extensive networks of radio transmitters and receivers at numerous telecommunications towers and other sites; and obtain "backhaul" – copper, microwave, or fiber connections from those sites to the rest of the network.  They must also deploy switches as part of their networks, and interconnect their networks with the networks of wireline carriers and other mobile wireless telecommunications services providers.  To be successful, providers also typically must engage in extensive marketing and develop a comprehensive network for retail distribution.

       12.     Mobile wireless telecommunications services include both voice and data services (e.g., texting and Internet access) provided over a radio network and allow customers to maintain their telephone calls or data sessions wirelessly when traveling.  Mobile wireless telecommunications providers offer their services on a variety of devices including mobile phones, smartphones, data cards, tablet computers, and netbooks.  In addition, an increasingly important group of customers are building mobile wireless capability into new devices, such as e-readers and vehicle tracking equipment, and contracting for mobile wireless telecommunications services on behalf of their own customers.  There are no cost-effective alternatives to mobile wireless telecommunications services.  Because neither fixed wireless services nor wireline services are mobile, they are not regarded by consumers of mobile wireless telecommunications services as reasonable substitutes.  In the face of a small but significant price increase imposed by a hypothetical monopolist it is unlikely that a sufficient number of customers would switch some or all of their usage from mobile wireless telecommunications

services to fixed wireless or wireline services such that the price increase or reduction in innovation would be unprofitable.  Mobile wireless telecommunications services accordingly is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

13.     Business customers, sometimes known as enterprises, and government customers often select and contract for mobile wireless telecommunications services for use by their employees in their professional and/or personal capacities.  These customers constitute a distinct set of customers for mobile wireless telecommunications services, and sales of mobile wireless telecommunications services covered by enterprise or government contracts amounted to more than $40 billion last year.  The selection and service requirements for enterprise and government customers are materially different than those of individual consumers.  Enterprise and government customers typically are served by dedicated groups of employees who work for the mobile wireless carriers, and such customers generally select their providers by soliciting bids, sometimes through an "RFP" (request for proposal) process.  Enterprise and government customers typically seek a carrier that can provide services to employees, facilities, and devices that are geographically dispersed.  Therefore, enterprise and government customers require services that are national in scope.  In addition, prices and terms tend to be more attractive for enterprise and government customers than for individuals, and include features such as pooled minutes as well as favorable device upgrade and replacement policies.  Enterprise and government service contracts often are individually negotiated, with carriers frequently providing discounts on particular RFPs in response to their competitors' offers.  There are no good substitutes for mobile wireless telecommunications services provided to enterprise and government customers, nor would a significant number of such customers switch to purchasing such services through ordinary retail channels in the event of a small but significant price

increase in services offered through the enterprise and government sales channels.  Accordingly,

mobile wireless telecommunications services provided to enterprise and government customers

is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**B.      Relevant Geographic Markets**

14.      Mobile wireless telecommunications services are sold to consumers in local

markets that are affected by nationwide competition among the dominant service providers.  It is

therefore appropriate both to identify local markets in which consumers purchase mobile

wireless telecommunications services and to identify the nature of the nationwide competition

affecting those markets.  AT&T's acquisition of T-Mobile will have nationwide competitive

effects across local markets.

15.      Because most customers use mobile wireless telecommunications services at and

near their workplaces and homes, they purchase services from providers that offer and market

services where they live, work, and travel on a regular basis.

16.      The nation's four largest providers of mobile wireless telecommunications

services, including AT&T and T-Mobile, provide and market service on a nationwide basis.

Other providers have limited networks that cover only particular localities and regions.  Those

smaller carriers typically do not market to customers outside of their respective network

coverage areas, and may not even sell to such customers; therefore, local or regional carriers are

not an attractive, or perhaps even available, option for those customers who live and work in

areas outside of these smaller providers' respective network coverage areas.

17.      Accordingly, from a consumer's perspective, local areas may be considered

relevant geographic markets for mobile wireless telecommunications services.  The Cellular

Market Areas ("CMAs") that the FCC has identified and used to license mobile wireless

telecommunications services providers for certain spectrum bands often approximate the areas within which customers have the same competitive choices.  AT&T and T-Mobile compete against each other in local markets across the United States that collectively encompass a large majority of U.S. mobile wireless telecommunications consumers.  Indeed, AT&T and T-Mobile compete head to head in at least 97 of the nation's top 100 CMAs as well as in many other areas. These 97 CMAs alone include over half of the U.S. population.  Each of these 97 CMAs, identified in Appendix B, effectively represents an area in which the transaction likely would substantially lessen competition for mobile wireless telecommunications services and each constitutes a relevant geographic market under Section 7 of the Clayton Act, 15 U.S.C. § 18.  In addition, as described below, the nationwide effects of the transaction likely would substantially lessen competition in local markets across the nation.

18.   In competing for customers in the 97 markets identified in Appendix B and other CMAs, AT&T and T-Mobile (as well as Verizon and Sprint) utilize networks that cover the vast majority of the U.S. population, advertise nationally, have nationally recognized brands, and offer pricing, plans, and devices that are available nationwide.  For a variety of reasons, there is little or no regional variation in the pricing plans offered by the Big Four nationwide carriers. Nationwide pricing simplifies customer service and billing, reduces consumer confusion that might otherwise result from regional pricing disparities, and allows the carriers to take advantage of nationwide advertising in promoting their services.  Similarly, when the Big Four carriers make devices available to the public, they typically make them available nationwide.  This too minimizes customers' confusion and dissatisfaction, and allows the carriers to take advantage of nationwide marketing.  In addition, the Big Four carriers generally deploy system technology on a nationwide basis, including critical components such as network standards, e.g., LTE or

HSPA+.  These technological choices are an important aspect of competition in the mobile wireless telecommunications services market.

19.     The national decision-making of the Big Four carriers results in nationwide competition across local markets.  Each of the Big Four firms making a competitive choice regarding a pricing plan, or other national competitive attribute, will consider competitive conditions across the United States, as the decision will take effect throughout the United States.  Because competitive decisions affecting technology, plans, prices, and device offerings are typically made at a national, rather than a local, level, the rivals that affect those decisions generally are those with sufficient national scale and scope, i.e., the Big Four.  As AT&T acknowledged less than three years ago during a merger proceeding, it aims to "develop its rate plans, features and prices in response to competitive conditions and offerings at the national levels – primarily the plans offered by the other national carriers."  As AT&T recognized, "the predominant forces driving competition among wireless carriers operate at the national level."  That remains the case today.

20.     Because, as AT&T admits, competition operates at a national level, it is appropriate to consider the competitive effects of the transaction at a national level.  There is no doubt that AT&T and T-Mobile compete against each other on a nationwide basis, make many decisions on a nationwide basis, and that this national competition is conducted in local markets that include the vast majority of the U.S. population.  Indeed, customers in local markets across the country often face very similar choices from AT&T, T-Mobile, Verizon, and Sprint, regardless of whether local or regional carriers also compete in any particular CMA.  It is necessary, therefore, to analyze competition at the national level in order to capture, as AT&T has stated, "the predominant forces driving competition among wireless carriers," and the impact

of these forces on competitive decisions and outcomes that are fundamentally national in nature.

Thus, whereas CMAs are appropriate geographic markets from the perspective of individual

consumer choice, from a seller's perspective, the Big Four carriers compete against each other on

a nationwide basis and AT&T's acquisition of T-Mobile will have nationwide competitive

effects across local markets.

21.     Enterprise and government customers often have multiple office and business

locations throughout the United States, and employees who may travel frequently.  Enterprise

and government customers often contract at the same time for employees located at these

multiple locations across the country.  Therefore, enterprise and government customers generally

require a mobile wireless provider with a nationwide network, and are willing to contract with a

carrier anywhere in the United States who has such a network.  Accordingly, the United States is

a relevant geographic market under Section 7 of the Clayton Act, 15 U.S.C. § 18, for mobile

wireless telecommunications services offered to enterprise and government customers.

### C.      Concentration

22.     Concentration in relevant markets is typically measured by the Herfindahl-

Hirschman Index ("HHI"), which is defined and explained in Appendix A to this Complaint.

Preliminary market share estimates demonstrate that in 96 of the nation's largest 100 CMAs – all

identified in Appendix B as representing relevant geographic markets for mobile wireless

telecommunications services – the post-merger HHI exceeds 2,500.  Such markets are considered

to be highly concentrated.  In one additional CMA identified in Appendix B, the post-merger

HHI falls just below 2,500 and the market would be considered moderately concentrated**.**

23.     In 91 of the 97 CMAs identified in Appendix B as representing relevant

geographic markets for mobile wireless telecommunications services – including all of the

nation's 40 largest markets – preliminary market share estimates demonstrate that AT&T's acquisition of T-Mobile would increase the HHI by more than 200 points.  Such an increase is presumed to be likely to enhance market power.  In an additional 6 CMAs, the increase would be at least 100, an increase that often raises significant competitive concerns.

24.     In more than half of the CMAs identified in Appendix B as representing relevant geographic markets for mobile wireless telecommunications services, the combined AT&T/T-Mobile would have a greater than 40 percent share.  In at least 15 of the CMAs, including major metropolitan markets such as Dallas, Houston, Oklahoma City, Birmingham, Honolulu, and Seattle, the combined firm would have a greater than 50 percent share – i.e., more customers than all the other firms combined.

25.     Nationally, the proposed merger would result in an HHI of more than 3,100 for mobile wireless telecommunications services, an increase of nearly 700 points.  These numbers substantially exceed the thresholds at which mergers are presumed to be likely to enhance market power.

26.     In the national market for mobile wireless telecommunications services provided to enterprise and government customers, the proposed merger would result in an HHI of at least 3,400, an increase of at least 300 points.  These numbers exceed the thresholds above which mergers are presumed to be likely to enhance market power.

**D.     Anticompetitive Effects**

**1.     Overview of T-Mobile's Importance as an Aggressive Competitor**

27.     Historically and currently, T-Mobile has positioned itself as the value option for wireless services, focusing on aggressive pricing, value leadership, and innovation.  As T-Mobile noted in a document generated in preparation for an investor's conference, the company views

13

itself as "the No. 1 value challenger of the established big guys in the market and as well

positioned in a consolidated 4-player national market."  T-Mobile's Chief Marketing Officer,

Cole Brodman, a 15-year veteran of the company, described T-Mobile as having "led the

industry in terms of defining rate plan value."  T-Mobile consumers benefit from the lower prices

offered by T-Mobile, while subscribers of Verizon, AT&T, and Sprint gain from more attractive

offerings that those firms are spurred to provide because of the attractive national value

proposition of T-Mobile.

28.     Innovation is well known to be an important driver of economic growth.

T-Mobile has been responsible for numerous "firsts" in the U.S. mobile wireless industry, as

outlined in an internal document entitled "T-Mobile Firsts:  Paving the way one first at a time."

The document lists the first Android handset, Blackberry wireless e-mail, the Sidekick (a

consumer "all-in-one" messaging device), national Wi-Fi "hotspot" access, and a variety of

unlimited service plans, among other firsts.

29.     T-Mobile has also been an innovator in terms of network development and

deployment.  For instance, T-Mobile was the first company to roll out and market a nationwide

network based on advanced HSPA+ technology and marketed as 4G.  Such investments in new

network technologies – spurred by competition among the Big Four – are valuable to consumers

as they increase the efficiency of spectrum use and allow for more mobile wireless services

output.

30.     AT&T has felt competitive pressure from T-Mobile's innovation.  As a January

2010 AT&T internal document observed in analyzing the roll-out of new competitive broadband

networks by several of its competitors:

> [T]he more immediate threat to AT&T is T-Mobile. . . .  On January 5th, 2010, it
> announced that it had upgraded its entire network with HSPA 7.2 covering 200M POPS.

It also reiterated prior statements that it would add HSPA+, capable of 3x the throughput of HSPA 7.2, across a substantial portion of its network by 2H 2010. . . . The one-two punch of an advanced network and the backhaul required to support the additional data demands should be taken seriously. . . .

By January 2011, an AT&T employee was observing that "TMO was first to have HSPA+ devices in their portfolio . . . . we added them in reaction to potential loss of speed claims." (Ellipsis in original.)

31.     After a period of disappointing results, T-Mobile recently brought in new management and launched plans to revitalize the company by returning to its roots as the industry value and innovation leader.  T-Mobile's executive team articulated its vision of T-Mobile's future in a November/December 2010 document titled "T-Mobile USA Challenger Strategy:  The Path Forward":

Our heritage and future is as a challenger brand.  TMUS will attack incumbents and find innovative ways to overcome scale disadvantages.  TMUS will be faster, more agile, and scrappy, with diligence on decisions and costs both big and small. Our approach to market will not be conventional, and we will push to the boundaries where possible. . . . TMUS will champion the customer and break down industry barriers with innovations . . . .

32.     Consistent with its history, and in a clear threat to larger rivals such as AT&T, T-Mobile decided to position itself as the carrier to "make smart phones affordable for the average US consumer."  A key component of T-Mobile's new strategy is to offer "Disruptive Pricing" plans to attract the estimated 150 million consumers whom T-Mobile believes will want a smartphone but do not yet have one.  T-Mobile's CEO Philipp Humm defined as "disruptive" a rate plan that "Verizon/ATT can't match."  T-Mobile has designed its new aggressive pricing plans to offer services, including data access, at rates lower than those offered by AT&T and Verizon, and it projects that the new plans will save consumers several hundred dollars per year as compared to similar AT&T and Verizon plans.

33.    Relying on its disruptive pricing plans, its improved high-speed HSPA+ network, and a variety of other initiatives, T-Mobile aimed to grow its nationwide share to 17 percent within the next several years, and to substantially increase its presence in the enterprise and government market.  AT&T's acquisition of T-Mobile would eliminate the important price, quality, product variety, and innovation competition that an independent T-Mobile brings to the marketplace.

### 2.    Competitive Harm:  Mobile Wireless Telecommunications Services

34.    AT&T and T-Mobile compete locally and nationally against each other, as well as against Verizon and Sprint, to attract mobile wireless telecommunications services customers, including in the markets identified in Appendix B.  They also compete nationally to attract enterprise and government customers for mobile wireless telecommunications services.  Competition taking place across a variety of dimensions, including price, plan structure, network coverage, quality, speeds, devices, and operating systems would be negatively impacted if this merger were to proceed.

35.    The proposed merger would eliminate T-Mobile, one of the four national competitors, resulting in a significant loss of competition, including in each of the 97 CMAs identified in Appendix B.  In some CMAs, AT&T, T-Mobile, Verizon, and Sprint are the only competitors with mobile wireless networks.  Although in other CMAs there are also one or two local or regional providers that do serve a significant number of customers, those smaller providers face significant competitive limitations, largely stemming from their lack of nationwide spectrum and networks.  They are therefore limited in their ability to competitively constrain the Big Four national carriers.  Among other limitations, the local and regional providers must depend on one of the four nationwide carriers to provide them with wholesale

services in the form of "roaming" in order to provide service in the vast majority of the United States (accounting for most of the U.S. population) that sits outside of their respective service areas. This places them at a significant cost disadvantage, particularly for the growing number of customers who use smartphones and exhibit considerable demand for data services. The local and regional providers also do not have the scale advantages of the four nationwide carriers, resulting in difficulties obtaining the most popular handsets, among other things. Due in large part to these limitations and disadvantages, these local and regional providers typically have small shares and none is as effective a constraint as is T-Mobile on AT&T, Verizon, and Sprint. Moreover, because each of the four nationwide firms typically offers prices, plans, and devices on a national basis, the regional and local providers – none of whom has a national share of more than 3 percent – exert little influence on these aspects of competition. As AT&T noted in connection with its acquisition of a regional carrier less than three years ago, that carrier's pricing was "an inconsequential factor in AT&T's competitive decision-making."

36.     The substantial increase in concentration that would result from this merger, and the reduction in the number of nationwide providers from four to three, likely will lead to lessened competition due to an enhanced risk of anticompetitive coordination. Certain aspects of mobile wireless telecommunications services markets, including transparent pricing, little buyer-side market power, and high barriers to entry and expansion, make them particularly conducive to coordination. Any anticompetitive coordination at a national level would result in higher nationwide prices (or other nationwide harm) by the remaining national providers, Verizon, Sprint, and the merged entity. Such harm would affect consumers all across the nation, including those in rural areas with limited T-Mobile presence. Furthermore, the potential for competitive harm is heightened given T-Mobile's recent decision to grow its market share via a "challenger"

17

strategy.  Its new aggressive and innovative pricing plans, low-priced smartphones, and superior

customer service would have been likely to disrupt current industry models and require

competitive responses from the other national players.  Through this proposed merger, AT&T

lessens this threat now, and, if the merger is approved, would eliminate it permanently.

37.     The proposed merger likely would lessen competition through elimination of

head-to-head competition between AT&T and T-Mobile.  Mobile wireless carriers sell

differentiated services.  Among the differentiating characteristics of greatest importance to

consumers are price, network coverage, service quality, customer support, and device options.

Not only do the carriers' offerings differ, but consumers have differing preferences as well.

Because both carriers and consumers are diverse, customers differ as to the firms that are their

closest and most desired alternatives.  Where there is significant substitution between the

merging firms by a substantial share of consumers, anticompetitive effects are likely to result.

Documents produced by AT&T and T-Mobile establish that a significant portion of customers

who "churn" from AT&T switch to T-Mobile, and vice versa.  This shows a significant degree of

head-to-head competition between the two companies, as demonstrated by T-Mobile's recent

television ads directly targeting AT&T.  The proposed merger would, therefore, likely eliminate

important competition between AT&T and T-Mobile.

38.     Moreover, tens of millions of Americans have selected T-Mobile as their mobile

wireless carrier because of its unique combination of services, plans, devices, network coverage,

features, and award-winning customer service.  By eliminating T-Mobile as an independent

competitor, the proposed transaction likely will reduce innovation and product variety – a serious

concern discussed in Section 6.4 of the *Horizontal Merger Guidelines,* issued by the U.S.

Department of Justice and the Federal Trade Commission.  For example, post-merger, AT&T

will no longer offer T-Mobile's lower-priced data and voice plans to new customers or current customers who upgrade their service.  Consequently, T-Mobile as a lower-priced option will be eliminated from the market, resulting in higher prices for a significant number of consumers.  Furthermore, the innovation that an independent T-Mobile brings to the market – as reflected in the array of industry "firsts" it has introduced in the past, such as the first Android phone, Blackberry e-mail, and the Sidekick – would also be lost, depriving consumers of important benefits.

39.     Similarly, competition, including from T-Mobile, has resulted in carriers making greater investments in technology that lead to better service quality.  By eliminating T-Mobile as an independent competitor, the proposed transaction likely will reduce the competitive incentive to invest in wireless networks to attract and retain customers.

40.     The presence of an independent, competitive T-Mobile, and the competition between T-Mobile and AT&T, has resulted in lower prices for mobile wireless telecommunications services across the country than otherwise would have existed.  If the proposed acquisition is consummated, AT&T will eliminate T-Mobile as an independent competitive constraint.  As a result, concentration will increase in many local markets and competition likely will be substantially lessened across the nation, resulting in higher prices, diminished investment, and less product variety and innovation than would exist without the merger, both with respect to services provided over today's mobile wireless devices, as well as future innovative devices that have yet to be developed.

### 3.     Competitive Harm:  Enterprise and Government Mobile Wireless Telecommunications Services

41.     In the national market for mobile wireless telecommunications services provided to enterprise and government customers, the proposed transaction effectively would reduce the

number of significant competitors from four to three.  Local and regional providers have an insignificant presence because enterprise and government customers typically require their providers to have nationwide networks, and because local and regional carriers generally refrain from bidding for out-of-network business due to the costs associated with paying roaming rates for services in locations outside of their network footprints.  In many instances, enterprise and government customers will contract with more than one of the mobile wireless providers to ensure ubiquitous coverage and provide employees with a choice.  In addition, contracting with multiple national carriers preserves the incentives for each carrier to provide competitive service enhancements for the duration of their contracts.  The reduction in the number of bidders for enterprise and government contracts to three – and in some cases fewer – significantly increases the risk of anticompetitive effects.

42.     T-Mobile historically has been particularly aggressive on price.  AT&T's acquisition of T-Mobile therefore removes potentially the most attractive bidder from many bid situations.  Accordingly, the merged firm likely will have a reduced incentive to submit low bids. In addition, the remaining bidders – typically Verizon and/or Sprint – also may bid less aggressively.  For some customers, such as enterprises whose employees travel extensively internationally, AT&T and T-Mobile are particularly close substitutes.

43.     Absent the proposed merger, T-Mobile would likely have an even more important competitive presence in the enterprise and government market going forward.  In the past, enterprise and government customers were not a primary focus for T-Mobile.  As part of its 2011 business plan, however, T-Mobile re-dedicated itself to becoming a bigger player with the stated goal of growing enterprise revenues substantially by 2013.

44.     T-Mobile makes its presence felt competing head to head with AT&T and other carriers for a number of accounts, winning business in some cases and often pushing prices lower when it does not.  The merger's elimination of T-Mobile as an aggressive competitor would likely result in fewer choices and higher prices for enterprise and government customers.

**E.     Entry**

45.     Entry by a new mobile wireless telecommunications services provider in the relevant geographic markets would be difficult, time-consuming, and expensive, requiring spectrum licenses and the construction of a network.  To replace the competition that would be lost from AT&T's elimination of T-Mobile as an independent competitor, moreover, a new entrant would need to have nationwide spectrum, a national network, scale economies that arise from having tens of millions of customers, and a strong brand, as well as other valued characteristics.  Therefore, entry in response to a small but significant price increase for mobile wireless telecommunications services would not be likely, timely, and sufficient to thwart the competitive harm resulting from AT&T's proposed acquisition of T-Mobile, if it were consummated.

**F.     Efficiencies**

46.     The Defendants cannot demonstrate merger-specific, cognizable efficiencies sufficient to reverse the acquisition's anticompetitive effects.

## V.  VIOLATION ALLEGED

47.      The effect of AT&T's proposed acquisition of T-Mobile, if it were to be consummated, likely will be to lessen competition substantially in interstate trade and commerce in the relevant geographic markets for mobile wireless telecommunications services, and enterprise and government mobile wireless telecommunications services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

48.      Unless enjoined, the transaction likely will have the following effects in mobile wireless telecommunications services in the relevant geographic markets, among others:

   a.       actual and potential competition between AT&T and T-Mobile will be eliminated;

   b.       competition in general likely will be lessened substantially;

   c.       prices are likely to be higher than they otherwise would;

   d.       the quality and quantity of services are likely to be less than they otherwise would due to reduced incentives to invest in capacity and technology improvements; and

   e.       innovation and product variety likely will be reduced.

## VI. REQUESTED RELIEF

The Plaintiffs request:

49.      That AT&T's proposed acquisition of T-Mobile be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

50.      That Defendants be permanently enjoined from and restrained from carrying out the Stock Purchase Agreement dated March 20, 2011, or from entering into or carrying out any

agreement, understanding, or plan, the effect of which would be to bring the telecommunications businesses of AT&T and T-Mobile under common ownership or control;

51.     That Plaintiffs be awarded their costs of this action;

52.     That Plaintiff States be awarded their reasonable attorneys' fees; and

53.     That Plaintiffs have such other relief as the Court may deem just and proper.

Dated this 16th day of September 2011.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

__/s/ Sharis A. Pozen_____
Sharis A. Pozen (D.C. Bar #446732)
Acting Assistant Attorney General

__/s/ Joseph F. Wayland_____
Joseph F. Wayland
Deputy Assistant Attorney General

__/s/ Gene I. Kimmelman_____
Gene I. Kimmelman (DC Bar #358534)
Chief Counsel for Competition Policy and
  Intergovernmental Relations

__/s/ Patricia A. Brink_____
Patricia A. Brink
Director of Civil Enforcement

__/s/ Laury E. Bobbish_____
Laury E. Bobbish
Chief, Telecommunications & Media
  Enforcement Section

__/s/ Claude F. Scott, Jr._____
Claude F. Scott, Jr. (D.C. Bar #414906)*

___/s/ Lawrence M. Frankel_____
Lawrence M. Frankel (D.C. Bar #441532)

__/s/ Hillary B. Burchuk_____
Hillary B. Burchuk (D.C. Bar #366755)

Kenneth M. Dintzer
Matthew C. Hammond
Shobitha Bhat
Katherine A. Celeste
Jillian E. Charles (D.C. Bar #459052)
Robert E. Draba (D.C. Bar #496815)
Stephen T. Fairchild
Lauren J. Fishbein (D.C. Bar #451889)
Kerrie J. Freeborn (D.C. Bar #503143)
Peter A. Gray
F. Patrick Hallagan
Ryan M. Kantor
Robert A. Lepore
Brent E. Marshall
William M. Martin
Kathleen S. O'Neill
Mark Tobey
Frank Y. Qi
Carl Willner (D.C. Bar #412841)

Attorneys
U.S. Department of Justice, Antitrust Division
Telecommunications & Media
  Enforcement Section
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
Phone:  (202) 514-5621
Facsimile:  (202) 514-6381
claude.scott@usdoj.gov

*Attorney of Record

FOR PLAINTIFF STATE OF NEW YORK

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
HARLAN A. LEVY
First Deputy Attorney General

By: _____/s/Richard L. Schwartz_____
Richard L. Schwartz
Geralyn J. Trujillo
Mary Ellen Burns
Keith H. Gordon
Matthew D. Siegel
STATE OF NEW YORK
Office of the Attorney General
120 Broadway, 26th Floor
New York, NY 10271-0332
Tel: (212) 416-8284
Fax: (212) 416-6015
Richard.Schwartz@ag.ny.gov
Geralyn.Trujillo@ag.ny.gov
MaryEllen.Burns@ag.ny.gov
Keith.Gordon@ag.ny.gov
Matthew.Siegel@ag.ny.gov

FOR PLAINTIFF STATE OF WASHINGTON:

ROBERT M. MCKENNA
Attorney General
TINA E. KONDO
Deputy Attorney General

By: _____/s/David M. Kerwin_____
David M. Kerwin (WSBA No. 35162)
Jonathan A. Mark (WSBA No. 38051)
Antitrust Division
800 Fifth Avenue, S. 2000
Seattle, WA 98104
Tel: (206) 464-7030
Fax: (206) 464-6338
davidk3@atg.wa.gov

FOR PLAINTIFF STATE OF CALIFORNIA:

KAMALA D. HARRIS
Attorney General of California
MARK BRECKLER
Chief Assistant Attorney General
KATHLEEN FOOTE
Senior Assistant Attorney General

By: _____/s/Quyen D. Toland_____
Quyen D. Toland (CA SBN 195429)
Deputy Attorney General
Office of the Attorney General
Antitrust Section
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel: (415) 703-5518
Fax: (415) 703-5480
Quyen.Toland@doj.ca.gov

Ben Labow (CA SBN 229443)
Deputy Attorney General
Office for the Attorney General
Antitrust Section
300 South Spring Street, Suite 1700
Los Angeles, CA 90013
Tel: (213) 897-2691
Fax: (213) 620-6005
Ben.Labow@doj.ca.gov

*Attorneys for the State of California*

FOR PLAINTIFF STATE OF ILLINOIS:

LISA MADIGAN
Attorney General
ROBERT W. PRATT
Chief, Antitrust Bureau

By:      /s/Robert W. Pratt
Robert W. Pratt
Chadwick O. Brooker
Office of Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3722
Fax: (312) 814-4209
rpratt@atg.state.il.us
cbrooker@atg.state.il.us

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

MARTHA COAKLEY
Attorney General


By: _____/s/William T. Matlack_____
William T. Matlack (MA BBO No. 552109)
Chief, Antitrust Division
Michael P. Franck (MA BBO No. 668132, D.C. Bar No. 501023[inactive])
Assistant Attorney General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184
William.Matlack@state.ma.us

R. MICHAEL DEWINE
Attorney General
JENNIFER L. PRATT
Assistant Attorney General
Chief, Antitrust Section

By:  _____/s/Jessica L. Brown_____
Jessica L. Brown (Ohio S.Ct. No. 86204)
Antitrust Division
150 E. Gay St. – 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269

*Attorneys for the State of Ohio*

FOR PLAINTIFF COMMONWEALTH OF
PENNSYLVANIA


LINDA L. KELLY
Attorney General

By: ____/s/James A. Donahue, III_____
JAMES A. DONAHUE, III (PA No. 42624)
Chief Deputy Attorney General
jdonahue@attorneygeneral.gov


By: _____/s/Joseph S. Betsko_____
Joseph S. Betsko (PA No. 82620)
Deputy Attorney General
jbetsko@attorneygeneral.gov


Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Fax: (717) 787-1190

*Attorneys for the Commonwealth of
Pennsylvania*

APPENDIX A
**Herfindahl-Hirschman Index**

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated.  *See Horizontal Merger Guidelines* § 5.3 (issued by the U.S. Department of Justice and the Federal Trade Commission on Aug. 19, 2010).  Transactions that increase the HHI by more than 200 points in highly concentrated markets will be presumed to be likely to enhance market power.  *Id*.  Mergers resulting in highly concentrated markets that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny.  *Id.*

i

APPENDIX B
**Relevant Geographic Market CMAs**

| CMA Number and Name | Post-merger share | HHI Post-Merger | Increase in HHI |
|---|---|---|---|
| 001-New York, NY-NJ | 43.7% | 3335 | 951 |
| 002-Los Angeles-Long Beach, CA | 41.4% | 3174 | 794 |
| 003-Chicago, IL | 48.1% | 3189 | 1114 |
| 004-Philadelphia, PA | 45.2% | 3385 | 918 |
| 005-Detroit/Ann Arbor, MI | 31.9% | 2857 | 420 |
| 006-Boston-Lowell-Brockton-Lawrence-Haverhill, MA-NH | 40.9% | 3495 | 731 |
| 007-San Francisco-Oakland, CA | 50.3% | 3438 | 763 |
| 008-Washington, DC-MD-VA | 39.6% | 3282 | 636 |
| 009-Dallas-Fort Worth, TX | 58.0% | 3980 | 1267 |
| 010-Houston, TX | 52.1% | 3578 | 1350 |
| 011-St. Louis, MO-IL | 46.7% | 3269 | 739 |
| 012-Miami-Fort Lauderdale-Hollywood, FL | 48.1% | 3341 | 1027 |
| 013-Pittsburgh, PA | 31.8% | 3650 | 347 |
| 014-Baltimore, MD | 36.5% | 3294 | 570 |
| 015-Minneapolis-St. Paul, MN-WI | 45.5% | 3596 | 1033 |
| 016-Cleveland, OH | 29.7% | 3717 | 365 |
| 017-Atlanta, GA | 46.6% | 3223 | 886 |
| 018-San Diego, CA | 40.8% | 3248 | 711 |
| 019-Denver-Boulder, CO | 41.9% | 3227 | 857 |
| 020-Seattle-Everett, WA | 53.2% | 4044 | 1376 |
| 021-Milwaukee, WI | 34.3% | 2493 | 394 |
| 022-Tampa-St. Petersburg, FL | 39.1% | 2935 | 741 |
| 023-Cincinnati, OH-KY-IN | 22.6% | 2575 | 215 |
| 024-Kansas City, MO-KS | 44.0% | 3329 | 948 |
| 025-Buffalo, NY | 31.6% | 3385 | 362 |
| 026-Phoenix, AZ | 32.9% | 3178 | 536 |
| 027-San Jose, CA | 48.6% | 3466 | 675 |
| 028-Indianapolis, IN | 41.5% | 3314 | 515 |
| 029-New Orleans, LA | 43.9% | 3579 | 607 |
| 030-Portland, OR-WA | 47.2% | 3629 | 963 |
| 031-Columbus, OH | 30.7% | 3412 | 407 |
| 032-Hartford-New Britain-Bristol, CT | 41.0% | 3657 | 538 |
| 033-San Antonio, TX | 43.4% | 3117 | 761 |
| 034-Rochester, NY | 26.5% | 4330 | 228 |
| 035-Sacramento, CA | 46.2% | 3238 | 697 |
| 036-Memphis, TN-AR-MS | 49.6% | 3136 | 892 |
| 037-Louisville, KY-IN | 48.0% | 3365 | 864 |
| 038-Providence-Warwick-Pawtucket, RI | 42.7% | 3509 | 902 |
| 039-Salt Lake City-Ogden, UT | 49.6% | 3653 | 1230 |
| 040-Dayton, OH | 29.2% | 2814 | 298 |
| 041-Birmingham, AL | 57.8% | 4181 | 1332 |
| 042-Bridgeport-Stamford-Norwalk-Danbury, CT | 40.3% | 3582 | 602 |
| 043-Norfolk-Virginia Beach-Portsmouth, VA/NC | 28.3% | 3103 | 384 |
| 044-Albany-Schenectady-Troy, NY | 30.8% | 3607 | 205 |
| 045-Oklahoma City, OK | 63.2% | 4399 | 1335 |
| 046-Nashville-Davidson, TN | 31.8% | 3164 | 347 |
| 047-Greensboro-Winston-Salem-High Point, NC | 28.2% | 3358 | 250 |
| 048-Toledo, OH-MI | 17.4% | 3822 | 127 |

| | | | |
|---|---|---|---|
| 049-New Haven-West Haven-Waterbury-Meriden, CT | 47.4% | 3671 | 770 |
| 050-Honolulu, HI | 55.5% | 3821 | 1531 |
| 051-Jacksonville, FL | 50.1% | 3482 | 1084 |
| 052-Akron, OH | 30.1% | 3849 | 354 |
| 053-Syracuse, NY | 35.9% | 3905 | 227 |
| 054-Gary-Hammond-East Chicago, IN | 40.3% | 3121 | 739 |
| 055-Worchester-Fitchburg-Leominster, MA | 38.7% | 3968 | 419 |
| 056-Northeast Pennsylvania, PA | 42.6% | 3935 | 414 |
| 057-Tulsa, OK | 57.6% | 3827 | 768 |
| 058-Allentown-Bethlehem-Easton, PA-NJ | 52.1% | 4060 | 1052 |
| 059-Richmond, VA | 24.6% | 3472 | 267 |
| 060-Orlando, FL | 49.3% | 3390 | 1086 |
| 061-Charlotte-Gastonia, NC | 31.4% | 3133 | 331 |
| 062-New Brunswick-Perth Amboy-Sayreville, NJ | 37.0% | 3753 | 635 |
| 063-Springfield-Chicopee-Holyoke, MA | 43.1% | 3896 | 840 |
| 064-Grand Rapids, MI | 24.5% | 3370 | 174 |
| 066-Youngstown-Warren, OH | 44.8% | 3438 | 639 |
| 067-Greenville-Spartanburg, SC | 30.3% | 4124 | 381 |
| 068-Flint, MI | 25.7% | 3168 | 163 |
| 069-Wilmington, DE-NJ-MD | 37.3% | 3426 | 469 |
| 070-Long Branch-Asbury Park, NJ | 28.9% | 4427 | 326 |
| 071-Raleigh-Durham, NC | 32.0% | 3236 | 279 |
| 072-West Palm Beach-Boca Raton, FL | 49.7% | 3317 | 788 |
| 073-Oxnard-Simi Valley-Ventura, CA | 41.9% | 3618 | 500 |
| 074-Fresno, CA | 53.6% | 3680 | 885 |
| 075-Austin, TX | 54.4% | 3867 | 1157 |
| 076-New Bedford-Fall River, MA | 38.4% | 3479 | 582 |
| 077-Tucson, AZ | 29.7% | 3394 | 431 |
| 078-Lansing-East Lansing, MI | 21.5% | 3689 | 155 |
| 079-Knoxville, TN | 27.0% | 2812 | 123 |
| 080-Baton Rouge, LA | 65.0% | 4838 | 611 |
| 081-El Paso, TX | 40.9% | 2877 | 751 |
| 082-Tacoma, WA | 41.8% | 3683 | 866 |
| 083-Mobile, AL | 57.8% | 4048 | 1177 |
| 084-Harrisburg, PA | 47.2% | 3973 | 576 |
| 085-Johnson City-Kingsport-Bristol, TN-VA | 24.7% | 4323 | 241 |
| 086-Albuquerque, NM | 33.4% | 3400 | 541 |
| 087-Canton, OH | 27.5% | 4242 | 267 |
| 088-Chattanooga, TN-GA | 27.6% | 3799 | 262 |
| 089-Wichita, KS | 40.5% | 3081 | 765 |
| 090-Charleston-North Charleston, SC | 36.2% | 3483 | 654 |
| 091-San Juan-Caguas, PR | 54.3% | 4022 | 1134 |
| 092-Little Rock-North Little Rock, AR | 53.9% | 3867 | 276 |
| 093-Las Vegas, NV | 45.6% | 3076 | 958 |
| 095-Columbia, SC | 31.4% | 3887 | 408 |
| 096-Fort Wayne, IN | 34.0% | 3824 | 314 |
| 097-Bakersfield, CA | 51.7% | 3643 | 795 |
| 099-York, PA | 48.6% | 3922 | 656 |
| 100-Shreveport, LA | 48.9% | 3618 | 197 |