**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-01560-ESH |
| | ) | |
| AT&T INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ANSWER TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants AT&T Inc. ("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), and Deutsche

Telekom AG ("DT") (jointly "Defendants") respond to the allegations of the Amended

Complaint as set forth below.  Any allegation not expressly and explicitly admitted is denied.

**GENERAL RESPONSE TO PLAINTIFFS' ALLEGATIONS**

The combination of T-Mobile and AT&T is good for consumers.  Integrating the two

networks will free up spectrum and create substantial new capacity to meet the spectacular

growth in demand resulting from an increasingly on-line world.  The new network will be more

than the sum of its parts:  as a result of engineering efficiencies enabled by the transaction, the

combined capacity of the new firm will be significantly greater than what the two companies

could do separately.  That means increased output, higher quality service, fewer dropped calls,

and lower prices to consumers than without the merger.  Rather than substantially reducing

competition, the combined firm will usher in more intense competition to an already vibrantly

competitive market.  While acknowledging the importance of merger efficiencies in enhancing

competition in the Department of Justice's Merger Guidelines, the Amended Complaint fails to

come to grips with the significant efficiencies this transaction will generate.

Plaintiffs' Amended Complaint similarly fails to depict accurately the state of competition in mobile telecommunications today, the dynamic nature of the wireless industry, or the pro-competitive and pro-consumer impact of this transaction. Wireless competition is fierce: prices have declined steadily, output is expanding, technological innovation is occurring at an extraordinary pace, and new providers with innovative business models have successfully entered and expanded. All of this will continue, and likely increase, after the transaction. The Amended Complaint largely ignores the significant competition from established providers such as Verizon Wireless and Sprint, innovative upstarts such as MetroPCS and Leap/Cricket, and strong regional providers like US Cellular and Cellular South, among others. Plaintiffs do not and cannot explain how, in the face of all of these aggressive rivals, the combined AT&T/T-Mobile will have any ability or incentive to restrict output, raise prices, or slow innovation. Nor can they explain how T-Mobile, the only major carrier to have actually lost subscribers in a robustly growing market, provides a unique competitive constraint on AT&T. They also fail to acknowledge that surging customer demand for wireless services drives carriers to invest, expand, and innovate.

This transaction is a response to, and will help mitigate, the spectrum shortage that has occurred as the number of wireless subscribers has grown from just over 100 million to more than 300 million in just the past decade and the use of wireless data services has increased dramatically. As FCC Chairman Genachowski recently explained, this "spectrum crunch" – if not addressed – will result in higher prices and reduced quality, to the detriment of consumers:

> If we do nothing in the face of the looming spectrum crunch, many consumers will face higher prices – as the market is forced to respond to supply and demand – and frustrating service – connections that drop, apps that run unreliably or too slowly. The result will be downward pressure on consumer use of wireless service, and a slowing down of innovation and investment in the space. Emerging markets like mobile medicine, mobile

payments, social-network-based services, and machine-to-machine connectivity will see their growth stunted.  This would hurt our economy broadly.[1]

AT&T is a leader in mobile broadband, in devices like smart phones and tablets, and in technology that drives mobile applications and next-generation services, but existing and future capacity constraints will jeopardize its competitiveness.  AT&T invested more than $30 billion in wireless spectrum and infrastructure from 2008-2010, including numerous network initiatives to squeeze as much capacity as possible out of its existing spectrum.  Yet customers' insatiable and growing demand for wireless data is placing unprecedented strains on AT&T's network and is impairing its ability to continue to meet explosive mobile broadband demands.  This transaction will enhance competition and benefit consumers by allowing AT&T to free up spectrum and expand capacity to offer more and better services to customers.

Although the transaction will remove T-Mobile as an independent competitor, no significant consumer harm will result.  For the past two years, T-Mobile has been losing customers despite growing demand, and, without the spectrum to deploy a 4G LTE network such as that deployed by the other carriers, there is no reason to expect a change in its undifferentiated competitive significance.  To the contrary, T-Mobile's business model remains "stuck in the middle" between larger providers like Verizon, AT&T, and Sprint, and lower-priced competitors like MetroPCS and Cricket.  And T-Mobile's German parent, Deutsche Telekom, announced that it would not continue to make significant investments in the United States.  Blocking this transaction will not help T-Mobile or its customers, but the transfer of T-Mobile's network capacity and infrastructure to AT&T, a healthy competitor, will enhance competition for all, now and in the future.

---

[1] Remarks Prepared for Delivery at 9, CTIA Wireless 2011 (Mar. 22, 2011).

As the wireless industry matured from 1999-2009, there was significant industry consolidation.  Yet consumers continually got more and better services for their money, infrastructure investment increased, services, features, and functionality were enhanced, and output continued to rise dramatically.  The increased output enabled by this transaction will continue this trend.

Thus, not only will Plaintiffs not be able to carry their burden of proof, but the relief they seek is itself anticompetitive, as it will severely set back growth and competition in the wireless industry.  Without this merger, AT&T will continue to experience capacity constraints, millions of customers will be deprived of faster and higher quality service, and innovation and infrastructure will be stunted.  If this transaction does not close due to Plaintiffs' lawsuit, wireless consumers will, as the FCC Chairman predicts, increasingly face higher prices and lower quality.

## RESPONSE TO SPECIFIC ALLEGATIONS

### I.      NATURE OF THE ACTION

1. *Mobile wireless telecommunications services are vital to the everyday lives of hundreds of millions of Americans. From their modest beginnings in the 1980s, when handsets were the size of a brick and coverage areas were limited, mobile wireless telecommunications devices have evolved into a profusion of smartphones, feature phones, tablets, data cards, e-readers, and other devices that use the nationwide mobile wireless telecommunications networks. Mobile wireless telecommunications services have become indispensable both to the way we live and to the way companies do business throughout the United States. Innovation in wireless technology drives innovation throughout our 21st-century information economy, helping to increase productivity, create jobs, and improve our daily lives. Vigorous competition is essential to ensuring continued innovation and maintaining low prices.*

**Response**:      Defendants admit that mobile wireless telecommunications services have become widely adopted and have enabled a wide variety of devices, applications, and services. Defendants also admit that innovation in mobile wireless telecommunications, derived from

many sources, has led to increased productivity and has improved the lives of people in the

United States and throughout the world.  Defendants further respond that the mobile wireless

telecommunications industry in the United States is intensely competitive.  Defendants deny the

remaining allegations in this paragraph.

> 2.  *On March 20, 2011, AT&T entered into a stock purchase agreement to acquire T-Mobile from its parent, Deutsche Telekom AG ("DT"), and to combine the two companies' mobile wireless telecommunications services businesses ("Transaction Agreement"). AT&T, with approximately 98.6 million connections to mobile wireless devices, and T-Mobile, with approximately 33.6 million connections, serve customers throughout the United States, with networks that each reach the homes of at least 90 percent of the U.S. population. AT&T and T-Mobile are two of only four mobile wireless providers with nationwide networks and a variety of competitive attributes associated with that national scale and presence. The other two nationwide networks are operated by Verizon Wireless ("Verizon") and Sprint Nextel Corp. ("Sprint"). Although smaller providers exist, they are significantly different from these four. For instance, none of the smaller carriers' voice networks cover even one-third of the U.S. population, and the largest of these smaller carriers has less than one-third the number of wireless connections as T-Mobile. Similarly, regional competitors often lack a nationwide data network, nationally recognized brands, significant nationwide spectrum holdings, and timely access to the most popular handsets. Collectively, the "Big Four" – AT&T, T-Mobile, Verizon, and Sprint – provide more than 90 percent of service connections to U.S. mobile wireless devices.*

**Response**:      Defendants admit the allegations in the first sentence of this paragraph.

Defendants further respond that the Amended Complaint's allegations regarding the percentage

of "service connections" provided by AT&T, T-Mobile, Verizon, and Sprint include service

provided by those carriers on a wholesale basis to other providers that independently set the

retail prices charged to their customers.  Defendants further respond that characterization of

AT&T, T-Mobile, Verizon, and Sprint as the "Big Four" is misleading in this context, because,

as the FCC has recently found in its Fifteenth Report[2] on the state of competition in the mobile

---

[2] Fifteenth Report, *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile*

services marketplace, more than 90% of U.S. consumers have at least five wireless providers to

choose from.  Defendants otherwise deny the allegations in this paragraph.

3.   *Due to the advantages arising from their scale and scope of coverage, each of the Big Four nationwide carriers is especially well-positioned to drive competition, at both a national and local level, in this industry. T-Mobile in particular – a company with a self-described "challenger brand," that historically has been a value provider, and that even within the past few months had been developing and deploying "disruptive pricing" plans – places important competitive pressure on its three larger rivals, particularly in terms of pricing, a critically important aspect of competition. AT&T's elimination of T-Mobile as an independent, low-priced rival would remove a significant competitive force from the market. Additionally, T-Mobile's investment in an advanced high-speed network and its innovations in technology and mobile wireless telecommunications services have provided, and continue to provide, consumers with significant value. Thus, unless this acquisition is enjoined, customers of mobile wireless telecommunications services likely will face higher prices, less product variety and innovation, and poorer quality services due to reduced incentives to invest than would exist absent the merger. Because AT&T's acquisition of T-Mobile likely would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, the Court should permanently enjoin this acquisition.*

**Response**:      Defendants respond that T-Mobile is losing customers and subscriber

shares in a growing market, is not a unique or material competitive constraint on AT&T, and will

not be one going forward in the absence of this transaction.  Defendants otherwise deny the

allegations in this paragraph.

## II.      JURISDICTION AND VENUE

4.   *The United States files this Complaint under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General and other authorized officials, bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States bring this action in their sovereign capacities and as parens patriae on behalf of the citizens, general welfare, and economy of each of their states.*

---

*Wireless, Including Commercial Mobile Services*, FCC 11-103, WT Docket No. 10-133 (June 27, 2011).

**Response**:     Defendants admit that Plaintiff United States has filed its Amended Complaint pursuant to Section 15 of the Clayton Act and that Plaintiff United States purports to seek to prevent and restrain Defendants from violating Section 7 of the Clayton Act.  Defendants also admit that Plaintiff States, by and through their respective Attorneys General and other authorized officials, have filed their Amended Complaint under Section 16 of the Clayton Act and that Plaintiff States purport to seek to prevent and restrain Defendants from violating Section 7 of the Clayton Act.  Defendants further admit that Plaintiff States brought this action in their sovereign capacities and as parens patriae on behalf of the citizens, general welfare, and economy of each of their states.  Defendants deny that the proposed transaction would violate the Clayton Act.

5.  *AT&T, DT, and T-Mobile are engaged in interstate commerce and in activities substantially affecting interstate commerce and commerce in each of the Plaintiff States. The Court has subject-matter jurisdiction over this action pursuant to Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 25 and 26, and 28 U.S.C. §§ 1331, 1337, 1345.*

**Response**:     Admitted.

6.  *Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1), (c). Defendants AT&T, DT, and T-Mobile transact business and are found within the District of Columbia. The Defendants have consented to personal jurisdiction in this judicial district.*

**Response**:     Admitted.

### III.     THE DEFENDANTS AND THE TRANSACTION

7.  *AT&T, with headquarters in Dallas, Texas, is a corporation organized and existing under the laws of the State of Delaware. AT&T is one of the world's largest providers of communications services, and the second-largest mobile wireless telecommunications services provider in the United States, as measured by subscribers. AT&T provides mobile wireless telecommunications services in 50 states, the District of Columbia, and Puerto Rico, providing approximately 98.6 million connections to mobile wireless devices. In 2010, AT&T's revenues from mobile wireless telecommunications services were $53.5 billion, and its total revenues were more than $124 billion.*

**Response**:     Defendants admit the allegations of this paragraph and further respond that AT&T provided approximately 98.6 million connections to mobile wireless devices as of the second quarter of 2011.

8. *T-Mobile, with headquarters in Bellevue, Washington, is a corporation organized and existing under the laws of the State of Delaware. T-Mobile is the fourth-largest mobile wireless telecommunications services provider in the United States as measured by subscribers. T-Mobile provides mobile wireless telecommunications services in 48 states, the District of Columbia, and Puerto Rico, providing approximately 33.6 million connections to mobile wireless devices. In 2010, T-Mobile's revenues from mobile wireless telecommunications services were approximately $18.7 billion. T-Mobile is a wholly owned subsidiary of Deutsche Telekom AG.*

**Response**:     Admitted.

9. *Deutsche Telekom AG is a German corporation headquartered in Bonn, Germany. It is the largest telecommunications operator in Europe with wireline and wireless interests in numerous countries and total annual revenues in 2010 of €62.4 billion.*

**Response**:     Admitted.

10. *Pursuant to the Transaction Agreement, AT&T will acquire T-Mobile for cash and stock worth approximately $39 billion. If this transaction is consummated, AT&T and T-Mobile would become the nation's largest wireless carrier. The merged firm would have approximately 132 million connections to mobile wireless devices in the United States, with more than $72 billion in mobile wireless telecommunications services revenues.*

**Response**:     Defendants admit the allegations in the first two sentences of this paragraph.  Defendants deny the remainder of the allegations in this paragraph.

## IV.     TRADE AND COMMERCE

### A.     Relevant Product Markets

11. *Mobile wireless telecommunications services allow customers to engage in telephone conversations and obtain data services using radio transmissions without being confined to a small area during a call or data session, and without requiring an unobstructed line of sight to a radio tower. Mobility is highly valued by customers, as demonstrated by the more than 300 million connections to mobile wireless devices in the United States. In 2010, revenues from the sale of mobile wireless telecommunications services in the United States were approximately $160 billion. To provide service, mobile wireless telecommunications carriers typically must acquire FCC licenses to utilize electromagnetic spectrum to transmit signals; deploy extensive networks of*

*radio transmitters and receivers at numerous telecommunications towers and other sites; and obtain "backhaul" – copper, microwave, or fiber connections from those sites to the rest of the network. They must also deploy switches as part of their networks, and interconnect their networks with the networks of wireline carriers and other mobile wireless telecommunications services providers. To be successful, providers also typically must engage in extensive marketing and develop a comprehensive network for retail distribution.*

**Response**:        Defendants admit the allegations in the first sentence of this paragraph.

Defendants admit that mobility is one attribute of mobile wireless service that customers value, along with many other attributes.  Defendants admit that, to provide facilities-based mobile wireless telecommunications service, carriers typically must acquire FCC licenses to utilize electromagnetic spectrum to transmit signals, or lease or otherwise obtain rights to use spectrum; deploy networks of radio transmitters and receivers at telecommunications towers and other sites; and obtain "backhaul" – copper, microwave, or fiber connections from those sites to the rest of the network; deploy switches or acquire switching services from other providers; and interconnect their networks with the networks of other mobile carriers and wireline carriers.

Defendants further respond that firms can and do compete in the mobile wireless telecommunications industry as resellers or mobile virtual network operators ("MVNOs") without acquiring rights to use electromagnetic spectrum or constructing or acquiring network facilities, by reselling network service provided by others, and that such resellers and MVNOs can be substantial and effective competitors.  Defendants deny the remainder of the allegations in this paragraph.

12. *Mobile wireless telecommunications services include both voice and data services (e.g., texting and Internet access) provided over a radio network and allow customers to maintain their telephone calls or data sessions wirelessly when traveling. Mobile wireless telecommunications providers offer their services on a variety of devices including mobile phones, smartphones, data cards, tablet computers, and netbooks. In addition, an increasingly important group of customers are building mobile wireless capability into new devices, such as e-readers and vehicle tracking equipment, and contracting for mobile wireless telecommunications services on behalf of their own customers. There are no cost-effective alternatives to mobile wireless telecommunications*

> *services. Because neither fixed wireless services nor wireline services are mobile, they are not regarded by consumers of mobile wireless telecommunications services as reasonable substitutes. In the face of a small but significant price increase imposed by a hypothetical monopolist it is unlikely that a sufficient number of customers would switch some or all of their usage from mobile wireless telecommunications services to fixed wireless or wireline services such that the price increase or reduction in innovation would be unprofitable. Mobile wireless telecommunications services accordingly is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.*

**Response**:      Defendants admit that wireless telecommunications services include voice and data services and that these services allow customers to maintain their voice calls or data sessions wirelessly when traveling.  Defendants admit the second sentence in this paragraph and add that mobile wireless telecommunications providers offer their services on a number of additional devices.  Defendants admit that certain customers are building mobile wireless capability into new devices, such as e-readers and vehicle tracking equipment, and contracting for mobile wireless telecommunications services on behalf of their customers, and further respond that the demand created by these and other new mobile devices and applications are contributing to the overall increase in demand.  Defendants admit that neither fixed wireless services nor wireline services are mobile, and that some consumers do not regard them as reasonable substitutes for mobile services.  Defendants deny the remainder of the allegations in this paragraph as pled.

> 13. *Business customers, sometimes known as enterprises, and government customers often select and contract for mobile wireless telecommunications services for use by their employees in their professional and/or personal capacities. These customers constitute a distinct set of customers for mobile wireless telecommunications services, and sales of mobile wireless telecommunications services covered by enterprise or government contracts amounted to more than $40 billion last year. The selection and service requirements for enterprise and government customers are materially different than those of individual consumers. Enterprise and government customers typically are served by dedicated groups of employees who work for the mobile wireless carriers, and such customers generally select their providers by soliciting bids, sometimes through an "RFP" (request for proposal) process. Enterprise and government customers typically seek a carrier that can provide services to employees, facilities, and devices that are geographically dispersed. Therefore, enterprise and government customers require services*

*that are national in scope. In addition, prices and terms tend to be more attractive for enterprise and government customers than for individuals, and include features such as pooled minutes as well as favorable device upgrade and replacement policies. Enterprise and government service contracts often are individually negotiated, with carriers frequently providing discounts on particular RFPs in response to their competitors' offers. There are no good substitutes for mobile wireless telecommunications services provided to enterprise and government customers, nor would a significant number of such customers switch to purchasing such services through ordinary retail channels in the event of a small but significant price increase in services offered through the enterprise and government sales channels. Accordingly, mobile wireless telecommunications services provided to enterprise and government customers is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.*

**Response**:      Defendants admit the allegations in the first sentence of this paragraph.

Defendants further respond that business customers are not a homogenous or distinct customer set, but differ significantly, *inter alia*, in size, geographical presence, product and service requirements, and payment arrangements.  Defendants otherwise deny the allegations in this paragraph as pled.

## B.      Relevant Geographic Markets

14. *Mobile wireless telecommunications services are sold to consumers in local markets that are affected by nationwide competition among the dominant service providers. It is therefore appropriate both to identify local markets in which consumers purchase mobile wireless telecommunications services and to identify the nature of the nationwide competition affecting those markets. AT&T's acquisition of T-Mobile will have nationwide competitive effects across local markets.*

**Response**:      Defendants deny the allegations in this paragraph.

15. *Because most customers use mobile wireless telecommunications services at and near their workplaces and homes, they purchase services from providers that offer and market services where they live, work, and travel on a regular basis.*

**Response**:      Defendants admit that consumers purchase mobile wireless telecommunications services locally.  Defendants deny the remainder of the allegations in this paragraph.

16. *The nation's four largest providers of mobile wireless telecommunications services, including AT&T and T-Mobile, provide and market service on a nationwide basis. Other providers have limited networks that cover only particular localities and regions. Those smaller carriers typically do not market to customers outside of their respective network coverage areas, and may not even sell to such customers; therefore, local or regional carriers are not an attractive, or perhaps even available, option for those customers who live and work in areas outside of these smaller providers' respective network coverage areas.*

**Response**:      Defendants deny the allegations in this paragraph.

17. *Accordingly, from a consumer's perspective, local areas may be considered relevant geographic markets for mobile wireless telecommunications services. The Cellular Market Areas ("CMAs") that the FCC has identified and used to license mobile wireless telecommunications services providers for certain spectrum bands often approximate the areas within which customers have the same competitive choices. AT&T and T-Mobile compete against each other in local markets across the United States that collectively encompass a large majority of U.S. mobile wireless telecommunications consumers. Indeed, AT&T and T-Mobile compete head to head in at least 97 of the nation's top 100 CMAs as well as in many other areas. These 97 CMAs alone include over half of the U.S. population. Each of these 97 CMAs, identified in Appendix B, effectively represents an area in which the transaction likely would substantially lessen competition for mobile wireless telecommunications services and each constitutes a relevant geographic market under Section 7 of the Clayton Act, 15 U.S.C. § 18. In addition, as described below, the nationwide effects of the transaction likely would substantially lessen competition in local markets across the nation.*

**Response**:      Defendants admit that consumers purchase mobile wireless telecommunications services locally.  Defendants admit the allegations in the second sentence of this paragraph.  Defendants admit that AT&T and T-Mobile both offer services across the United States that collectively encompass a large majority of U.S. mobile wireless telecommunications consumers.  Defendants further respond that other competitors also offer services in these Cellular Market Areas ("CMAs").  Defendants deny the remainder of the allegations in this paragraph as pled.

18. *In competing for customers in the 97 markets identified in Appendix B and other CMAs, AT&T and T-Mobile (as well as Verizon and Sprint) utilize networks that cover the vast majority of the U.S. population, advertise nationally, have nationally recognized brands, and offer pricing, plans, and devices that are available nationwide. For a variety of reasons, there is little*

*or no regional variation in the pricing plans offered by the Big Four
nationwide carriers. Nationwide pricing simplifies customer service and
billing, reduces consumer confusion that might otherwise result from regional
pricing disparities, and allows the carriers to take advantage of nationwide
advertising in promoting their services. Similarly, when the Big Four carriers
make devices available to the public, they typically make them available
nationwide. This too minimizes customers' confusion and dissatisfaction, and
allows the carriers to take advantage of nationwide marketing. In addition, the
Big Four carriers generally deploy system technology on a nationwide basis,
including critical components such as network standards, e.g., LTE or
HSPA+. These technological choices are an important aspect of competition
in the mobile wireless telecommunications services market.*

**Response**:      Defendants admit that they have networks that cover a large portion of the

U.S. population, that they advertise nationally and have brands that are well-recognized, and that

their recurring monthly pricing plans generally are the same nationwide.  Defendants further

respond that, as a result of local variations in device pricing and promotions, as well as

promotions and discounts on other elements of customers' purchases, the ultimate prices paid by

mobile wireless telecommunications customers can and do vary depending on where the

customer buys Defendants' products and services.  Defendants deny the remainder of the

allegations in this paragraph.

19. *The national decision-making of the Big Four carriers results in nationwide
competition across local markets. Each of the Big Four firms making a
competitive choice regarding a pricing plan, or other national competitive
attribute, will consider competitive conditions across the United States, as the
decision will take effect throughout the United States. Because competitive
decisions affecting technology, plans, prices, and device offerings are typically
made at a national, rather than a local, level, the rivals that affect those
decisions generally are those with sufficient national scale and scope, i.e., the
Big Four. As AT&T acknowledged less than three years ago during a merger
proceeding, it aims to "develop its rate plans, features and prices in response
to competitive conditions and offerings at the national levels – primarily the
plans offered by the other national carriers." As AT&T recognized, "the
predominant forces driving competition among wireless carriers operate at the
national level." That remains the case today.*

**Response**:      Defendants deny the allegations in this paragraph.

20. *Because, as AT&T admits, competition operates at a national level, it is
appropriate to consider the competitive effects of the transaction at a national
level. There is no doubt that AT&T and T-Mobile compete against each other*

*on a nationwide basis, make many decisions on a nationwide basis, and that this national competition is conducted in local markets that include the vast majority of the U.S. population. Indeed, customers in local markets across the country often face very similar choices from AT&T, T-Mobile, Verizon, and Sprint, regardless of whether local or regional carriers also compete in any particular CMA. It is necessary, therefore, to analyze competition at the national level in order to capture, as AT&T has stated, "the predominant forces driving competition among wireless carriers," and the impact of these forces on competitive decisions and outcomes that are fundamentally national in nature. Thus, whereas CMAs are appropriate geographic markets from the perspective of individual consumer choice, from a seller's perspective, the Big Four carriers compete against each other on a nationwide basis and AT&T's acquisition of T-Mobile will have nationwide competitive effects across local markets.*

**Response**:      Defendants respond that Plaintiffs' selective quotation of unidentified written material, without context, is misleading and inappropriate.  Defendants otherwise deny the allegations in this paragraph.

> 21. *Enterprise and government customers often have multiple office and business locations throughout the United States, and employees who may travel frequently. Enterprise and government customers often contract at the same time for employees located at these multiple locations across the country. Therefore, enterprise and government customers generally require a mobile wireless provider with a nationwide network, and are willing to contract with a carrier anywhere in the United States who has such a network. Accordingly, the United States is a relevant geographic market under Section 7 of the Clayton Act, 15 U.S.C. § 18, for mobile wireless telecommunications services offered to enterprise and government customers.*

**Response**:      Defendants admit that some enterprise and government customers may have multiple office and business locations throughout the United States, and some employees who may travel frequently.  Defendants admit that some enterprise and government customers may at times choose to contract for employees located at multiple locations across the country.  Defendants deny the remainder of the allegations in this paragraph as pled.

## C.      Concentration

> 22. *Concentration in relevant markets is typically measured by the Herfindahl-Hirschman Index ("HHI"), which is defined and explained in Appendix A to this Complaint. Preliminary market share estimates demonstrate that in 96 of the nation's largest 100 CMAs – all identified in Appendix B as representing relevant geographic markets for mobile wireless telecommunications services*

> *– the post-merger HHI exceeds 2,500. Such markets are considered to be highly concentrated. In one additional CMA identified in Appendix B, the post-merger HHI falls just below 2,500 and the market would be considered moderately concentrated.*

**Response**:        Defendants admit that the Herfindahl-Hirschman Index ("HHI") is used by Plaintiffs as a measure of market concentration, and that the HHI is calculated by squaring the market share of each firm competing in a relevant market and then summing the resulting numbers.  Defendants admit that the HHI approaches zero when a relevant market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a relevant market is controlled by a single firm.  Defendants admit that the HHI increases both as the number of firms in a relevant market decreases and as the disparity in size across those firms increases.  Defendants admit that the Horizontal Merger Guidelines issued by the U.S. Department of Justice and the Federal Trade Commission on August 19, 2010, reference the HHI, but otherwise state that the Horizontal Merger Guidelines speak for themselves.  Defendants further respond that the HHI analysis is only one factor in merger analysis, and that a complete analysis must take full account of competitive dynamics and efficiencies not captured by such simplistic calculations.  Defendants deny the remainder of the allegations in this paragraph and in Appendices A and B.

> 23. *In 91 of the 97 CMAs identified in Appendix B as representing relevant geographic markets for mobile wireless telecommunications services – including all of the nation's 40 largest markets – preliminary market share estimates demonstrate that AT&T's acquisition of T-Mobile would increase the HHI by more than 200 points. Such an increase is presumed to be likely to enhance market power. In an additional 6 CMAs, the increase would be at least 100, an increase that often raises significant competitive concerns.*

**Response**:        Defendants hereby incorporate the response to Paragraph 22 as if fully set forth herein.  Defendants otherwise deny the allegations in this paragraph.

> 24. *In more than half of the CMAs identified in Appendix B as representing relevant geographic markets for mobile wireless telecommunications services, the combined AT&T/T-Mobile would have a greater than 40 percent share. In*

> *at least 15 of the CMAs, including major metropolitan markets such as Dallas,*
> *Houston, Oklahoma City, Birmingham, Honolulu, and Seattle, the combined*
> *firm would have a greater than 50 percent share – i.e., more customers than*
> *all the other firms combined.*

**Response**:      Defendants hereby incorporate the response to Paragraph 22 as if fully set

forth herein.  Defendants otherwise deny the allegations in this paragraph.

> 25. *Nationally, the proposed merger would result in an HHI of more than 3,100*
> *for mobile wireless telecommunications services, an increase of nearly 700*
> *points. These numbers substantially exceed the thresholds at which mergers*
> *are presumed to be likely to enhance market power.*

**Response**:      Defendants hereby incorporate the response to Paragraph 22 as if fully set

forth herein.  Defendants otherwise deny the allegations in this paragraph.

> 26. *In the national market for mobile wireless telecommunications services*
> *provided to enterprise and government customers, the proposed merger would*
> *result in an HHI of at least 3,400, an increase of at least 300 points. These*
> *numbers exceed the thresholds above which mergers are presumed to be likely*
> *to enhance market power.*

**Response**:      Defendants hereby incorporate the response to Paragraph 22 as if fully set

forth herein.  Defendants otherwise deny the allegations in this paragraph.

**D.      Anticompetitive Effects**

**1.      Overview of T-Mobile's Importance as an Aggressive Competitor**

> 27. *Historically and currently, T-Mobile has positioned itself as the value option*
> *for wireless services, focusing on aggressive pricing, value leadership, and*
> *innovation. As T-Mobile noted in a document generated in preparation for an*
> *investor's conference, the company views itself as "the No. 1 value challenger*
> *of the established big guys in the market and as well positioned in a*
> *consolidated 4-player national market." T-Mobile's Chief Marketing Officer,*
> *Cole Brodman, a 15-year veteran of the company, described T-Mobile as*
> *having "led the industry in terms of defining rate plan value." T-Mobile*
> *consumers benefit from the lower prices offered by T-Mobile, while*
> *subscribers of Verizon, AT&T, and Sprint gain from more attractive offerings*
> *that those firms are spurred to provide because of the attractive national value*
> *proposition of T-Mobile.*

**Response**:      Defendants respond that Plaintiffs' selective quotation of unidentified

written material, offered without context, is misleading and inappropriate.  Defendants further

respond that currently, T-Mobile is not a unique or material competitive constraint on AT&T.

Defendants otherwise deny the allegations in this paragraph.

> 28. *Innovation is well known to be an important driver of economic growth. T-Mobile has been responsible for numerous "firsts" in the U.S. mobile wireless industry, as outlined in an internal document entitled "T-Mobile Firsts: Paving the way one first at a time." The document lists the first Android handset, Blackberry wireless e-mail, the Sidekick (a consumer "all-in-one" messaging device), national Wi-Fi "hotspot" access, and a variety of unlimited service plans, among other firsts.*

**Response**:      Defendants admit the allegations in the first sentence of this paragraph.

Defendants further respond that currently, T-Mobile is not a unique or material competitive

constraint on AT&T.  Defendants further respond that Plaintiffs' selective quotation of

unidentified written material, without context, is misleading and inappropriate.  Defendants deny

the remainder of the allegations in this paragraph.

> 29. *T-Mobile has also been an innovator in terms of network development and deployment. For instance, T-Mobile was the first company to roll out and market a nationwide network based on advanced HSPA+ technology and marketed as 4G. Such investments in new network technologies – spurred by competition among the Big Four – are valuable to consumers as they increase the efficiency of spectrum use and allow for more mobile wireless services output.*

**Response**:      Defendants admit that investments in new network development and

deployment can be valuable to consumers, where they increase the efficiency of spectrum use

and allow for more mobile wireless services output.  Defendants admit that T-Mobile has

deployed a network based on HSPA+ technology, which it markets as 4G.  Defendants further

respond that T-Mobile has not been a meaningful or unique innovator in terms of network

development and deployment, nor is it likely to become one in the foreseeable future.

Defendants deny the remainder of the allegations in this paragraph.

> 30. *AT&T has felt competitive pressure from T-Mobile's innovation. As a January 2010 AT&T internal document observed in analyzing the roll-out of new competitive broadband networks by several of its competitors:*

> *[T]he more immediate threat to AT&T is T-Mobile. . . . On January 5th, 2010, it announced that it had upgraded its entire network with HSPA 7.2 covering 200M POPS.  It also reiterated prior statements that it would add HSPA+, capable of 3x the throughput of HSPA 7.2, across a substantial portion of its network by 2H 2010. . . . The one-two punch of an advanced network and the backhaul required to support the additional data demands should be taken seriously. . . .*

> *By January 2011, an AT&T employee was observing that "TMO was first to have HSPA+ devices in their portfolio . . . . we added them in reaction to potential loss of speed claims." (Ellipsis in original.)*

**Response**:      Defendants respond that Plaintiffs' selective quotation of unidentified written material, offered without context, is misleading and inappropriate.  Defendants otherwise deny the allegations in this paragraph.

> 31.  *After a period of disappointing results, T-Mobile recently brought in new management and launched plans to revitalize the company by returning to its roots as the industry value and innovation leader. T-Mobile's executive team articulated its vision of T-Mobile's future in a November/December 2010 document titled "T-Mobile USA Challenger Strategy: The Path Forward":*

> *Our heritage and future is as a challenger brand. TMUS will attack incumbents and find innovative ways to overcome scale disadvantages. TMUS will be faster, more agile, and scrappy, with diligence on decisions and costs both big and small. Our approach to market will not be conventional, and we will push to the boundaries where possible. . . . TMUS will champion the customer and break down industry barriers with innovations . . . .*

**Response**:      Defendants respond that Plaintiffs' selective quotation of unidentified written material, without context, is misleading and inappropriate.  Defendants further respond that, despite repeated strategic initiatives, including the strategy referenced in this paragraph, T-Mobile has continued to lose customers and share.  T-Mobile is not currently a unique or material competitive constraint on AT&T.  Defendants otherwise deny the allegations in this paragraph.

> 32.  *Consistent with its history, and in a clear threat to larger rivals such as AT&T, T-Mobile decided to position itself as the carrier to "make smart phones affordable for the average US consumer." A key component of T-Mobile's new strategy is to offer "Disruptive Pricing" plans to attract the estimated 150 million consumers whom T-Mobile believes will want a smartphone but do not yet have one. T-Mobile's CEO Philipp Humm defined as "disruptive" a rate*

> *plan that "Verizon/ATT can't match." T-Mobile has designed its new*
> *aggressive pricing plans to offer services, including data access, at rates lower*
> *than those offered by AT&T and Verizon, and it projects that the new plans*
> *will save consumers several hundred dollars per year as compared to similar*
> *AT&T and Verizon plans.*

**Response**:    Defendants respond that Plaintiffs' selective quotation of unidentified

written material, without context, is misleading and inappropriate.  Defendants deny the

allegations in this paragraph.

> 33. *Relying on its disruptive pricing plans, its improved high-speed HSPA+*
> *network, and a variety of other initiatives, T-Mobile aimed to grow its*
> *nationwide share to 17 percent within the next several years, and to*
> *substantially increase its presence in the enterprise and government market.*
> *AT&T's acquisition of T-Mobile would eliminate the important price, quality,*
> *product variety, and innovation competition that an independent T-Mobile*
> *brings to the marketplace.*

**Response**:    Defendants deny the allegations in this paragraph.

## 2.    Competitive Harm: Mobile Wireless Telecommunications Services

> 34. *AT&T and T-Mobile compete locally and nationally against each other, as*
> *well as against Verizon and Sprint, to attract mobile wireless*
> *telecommunications services customers, including in the markets identified in*
> *Appendix B. They also compete nationally to attract enterprise and*
> *government customers for mobile wireless telecommunications services.*
> *Competition taking place across a variety of dimensions, including price, plan*
> *structure, network coverage, quality, speeds, devices, and operating systems*
> *would be negatively impacted if this merger were to proceed.*

**Response**:    Defendants respond that competition in the wireless telecommunications

industry takes place across a variety of dimensions including but not limited to those referenced

in the last sentence.  Defendants otherwise deny the allegations in this paragraph.

> 35. *The proposed merger would eliminate T-Mobile, one of the four national*
> *competitors, resulting in a significant loss of competition, including in each of*
> *the 97 CMAs identified in Appendix B. In some CMAs, AT&T, T-Mobile,*
> *Verizon, and Sprint are the only competitors with mobile wireless networks.*
> *Although in other CMAs there are also one or two local or regional providers*
> *that do serve a significant number of customers, those smaller providers face*
> *significant competitive limitations, largely stemming from their lack of*
> *nationwide spectrum and networks. They are therefore limited in their ability*
> *to competitively constrain the Big Four national carriers. Among other*
> *limitations, the local and regional providers must depend on one of the four*

*nationwide carriers to provide them with wholesale services in the form of "roaming" in order to provide service in the vast majority of the United States (accounting for most of the U.S. population) that sits outside of their respective service areas. This places them at a significant cost disadvantage, particularly for the growing number of customers who use smartphones and exhibit considerable demand for data services. The local and regional providers also do not have the scale advantages of the four nationwide carriers, resulting in difficulties obtaining the most popular handsets, among other things. Due in large part to these limitations and disadvantages, these local and regional providers typically have small shares and none is as effective a constraint as is T-Mobile on AT&T, Verizon, and Sprint. Moreover, because each of the four nationwide firms typically offers prices, plans, and devices on a national basis, the regional and local providers – none of whom has a national share of more than 3 percent – exert little influence on these aspects of competition. As AT&T noted in connection with its acquisition of a regional carrier less than three years ago, that carrier's pricing was "an inconsequential factor in AT&T's competitive decision-making."*

**Response**:    Defendants admit that in a small number of CMAs, AT&T, T-Mobile, Verizon, and Sprint are the only competitors with mobile wireless networks, but deny that no other competitors are offering mobile wireless telecommunications services in such areas. Defendants further respond that, in many CMAs, other firms hold FCC licenses to provide mobile wireless service but are not currently operating networks.  Defendants further respond that Plaintiffs' selective quotation of unidentified written material, without context, is misleading and inappropriate.  Defendants otherwise deny the remainder of the allegations in this paragraph.

*36. The substantial increase in concentration that would result from this merger, and the reduction in the number of nationwide providers from four to three, likely will lead to lessened competition due to an enhanced risk of anticompetitive coordination. Certain aspects of mobile wireless telecommunications services markets, including transparent pricing, little buyer-side market power, and high barriers to entry and expansion, make them particularly conducive to coordination. Any anticompetitive coordination at a national level would result in higher nationwide prices (or other nationwide harm) by the remaining national providers, Verizon, Sprint, and the merged entity. Such harm would affect consumers all across the nation, including those in rural areas with limited T-Mobile presence. Furthermore, the potential for competitive harm is heightened given T-Mobile's recent decision to grow its market share via a "challenger" strategy. Its new aggressive and innovative pricing plans, low-priced smartphones, and superior customer service would have been likely to disrupt current industry models and require competitive responses from the other national players. Through this proposed merger, AT&T lessens this threat now, and, if the merger is approved, would eliminate it permanently.*

**Response**:        Defendants deny the allegations in this paragraph.

37.   *The proposed merger likely would lessen competition through elimination of head-to-head competition between AT&T and T-Mobile. Mobile wireless carriers sell differentiated services. Among the differentiating characteristics of greatest importance to consumers are price, network coverage, service quality, customer support, and device options. Not only do the carriers' offerings differ, but consumers have differing preferences as well. Because both carriers and consumers are diverse, customers differ as to the firms that are their closest and most desired alternatives. Where there is significant substitution between the merging firms by a substantial share of consumers, anticompetitive effects are likely to result. Documents produced by AT&T and T-Mobile establish that a significant portion of customers who "churn" from AT&T switch to T-Mobile, and vice versa. This shows a significant degree of head-to-head competition between the two companies, as demonstrated by T-Mobile's recent television ads directly targeting AT&T. The proposed merger would, therefore, likely eliminate important competition between AT&T and T-Mobile.*

**Response**:        Defendants admit the allegations in the second sentence of this paragraph. Defendants admit that differentiating characteristics of importance to consumers include but are not limited to price, network coverage, service quality, customer support, and device options. Defendants admit the allegations in the fourth and fifth sentences of this paragraph.  Defendants deny the remainder of the allegations in this paragraph.

38.   *Moreover, tens of millions of Americans have selected T-Mobile as their mobile wireless carrier because of its unique combination of services, plans, devices, network coverage, features, and award-winning customer service. By eliminating T-Mobile as an independent competitor, the proposed transaction likely will reduce innovation and product variety – a serious concern discussed in Section 6.4 of the Horizontal Merger Guidelines, issued by the U.S. Department of Justice and the Federal Trade Commission. For example, post-merger, AT&T will no longer offer T-Mobile's lower-priced data and voice plans to new customers or current customers who upgrade their service. Consequently, T-Mobile as a lower-priced option will be eliminated from the market, resulting in higher prices for a significant number of consumers. Furthermore, the innovation that an independent T-Mobile brings to the market – as reflected in the array of industry "firsts" it has introduced in the past, such as the first Android phone, Blackberry e-mail, and the Sidekick – would also be lost, depriving consumers of important benefits.*

**Response**:        Defendants deny the allegations in this paragraph.

39.   *Similarly, competition, including from T-Mobile, has resulted in carriers making greater investments in technology that lead to better service quality. By eliminating T-Mobile as an independent competitor, the proposed*

> *transaction likely will reduce the competitive incentive to invest in wireless networks to attract and retain customers.*

**Response**:     Defendants deny the allegations in this paragraph.

> 40. *The presence of an independent, competitive T-Mobile, and the competition between T-Mobile and AT&T, has resulted in lower prices for mobile wireless telecommunications services across the country than otherwise would have existed. If the proposed acquisition is consummated, AT&T will eliminate T-Mobile as an independent competitive constraint. As a result, concentration will increase in many local markets and competition likely will be substantially lessened across the nation, resulting in higher prices, diminished investment, and less product variety and innovation than would exist without the merger, both with respect to services provided over today's mobile wireless devices, as well as future innovative devices that have yet to be developed.*

**Response**:     Defendants admit that, if the proposed acquisition is consummated, T-Mobile will no longer be an independent provider of wireless service.  Defendants deny the remainder of the allegations in this paragraph.

### 3.     Competitive Harm: Enterprise and Government Mobile Wireless Telecommunications Services

> 41. *In the national market for mobile wireless telecommunications services provided to enterprise and government customers, the proposed transaction effectively would reduce the number of significant competitors from four to three. Local and regional providers have an insignificant presence because enterprise and government customers typically require their providers to have nationwide networks, and because local and regional carriers generally refrain from bidding for out-of-network business due to the costs associated with paying roaming rates for services in locations outside of their network footprints. In many instances, enterprise and government customers will contract with more than one of the mobile wireless providers to ensure ubiquitous coverage and provide employees with a choice. In addition, contracting with multiple national carriers preserves the incentives for each carrier to provide competitive service enhancements for the duration of their contracts. The reduction in the number of bidders for enterprise and government contracts to three – and in some cases fewer – significantly increases the risk of anticompetitive effects.*

**Response**:     Defendants admit that some enterprise and government customers will contract with more than one mobile wireless provider to ensure coverage and provide employees with choices.  Defendants deny the remainder of the allegations in this paragraph.

42. *T-Mobile historically has been particularly aggressive on price. AT&T's acquisition of T-Mobile therefore removes potentially the most attractive bidder from many bid situations. Accordingly, the merged firm likely will have a reduced incentive to submit low bids. In addition, the remaining bidders – typically Verizon and/or Sprint – also may bid less aggressively. For some customers, such as enterprises whose employees travel extensively internationally, AT&T and T-Mobile are particularly close substitutes.*

**Response**:     Defendants deny the allegations in this paragraph.

43. *Absent the proposed merger, T-Mobile would likely have an even more important competitive presence in the enterprise and government market going forward. In the past, enterprise and government customers were not a primary focus for T-Mobile. As part of its 2011 business plan, however, T-Mobile re-dedicated itself to becoming a bigger player with the stated goal of growing enterprise revenues substantially by 2013.*

**Response**:     Defendants respond that, in the past, T-Mobile has not placed a primary focus on enterprise and government customers.  Defendants further respond that the reference in this paragraph to T-Mobile's 2011 business plan is misleading and without proper context, as T-Mobile presently lacks many of the necessary resources to pursue the referenced aspirations with respect to enterprise customers.  Defendants otherwise deny the allegations in this paragraph.

44. *T-Mobile makes its presence felt competing head to head with AT&T and other carriers for a number of accounts, winning business in some cases and often pushing prices lower when it does not. The merger's elimination of T-Mobile as an aggressive competitor would likely result in fewer choices and higher prices for enterprise and government customers.*

**Response**:     Defendants deny the allegations in this paragraph.

E.     **Entry**

45. *Entry by a new mobile wireless telecommunications services provider in the relevant geographic markets would be difficult, time-consuming, and expensive, requiring spectrum licenses and the construction of a network. To replace the competition that would be lost from AT&T's elimination of T-Mobile as an independent competitor, moreover, a new entrant would need to have nationwide spectrum, a national network, scale economies that arise from having tens of millions of customers, and a strong brand, as well as other valued characteristics. Therefore, entry in response to a small but significant price increase for mobile wireless telecommunications services would not be*

23

*likely, timely, and sufficient to thwart the competitive harm resulting from
AT&T's proposed acquisition of T-Mobile, if it were consummated.*

**Response**:       Defendants deny the allegations in this paragraph.

### F.       Efficiencies

46. *The Defendants cannot demonstrate merger-specific, cognizable efficiencies
    sufficient to reverse the acquisition's anticompetitive effects.*

**Response**:       Defendants respond that significant efficiencies more than outweigh any
anticompetitive effect from this merger.  Defendants further respond that the Horizontal Merger
Guidelines make clear that cost savings and other efficiencies can "reduce … the merged firm's
incentive to elevate prices," "make coordination less likely," and more generally "reverse the
merger's potential to harm customers."  Defendants further respond that it is Plaintiffs' burden to
prove that, on balance, in light of all the evidence, including the pro-competitive, efficiency-
enhancing effects, the net effect of the transaction is to substantially lessen competition.
Defendants otherwise deny the allegations in this paragraph.

## V.       VIOLATION ALLEGED

47. *The effect of AT&T's proposed acquisition of T-Mobile, if it were to be
    consummated, likely will be to lessen competition substantially in interstate
    trade and commerce in the relevant geographic markets for mobile wireless
    telecommunications services, and enterprise and government mobile wireless
    telecommunications services, in violation of Section 7 of the Clayton Act, 15
    U.S.C. § 18.*

**Response**:       Defendants deny the allegations in this paragraph.

48. *Unless enjoined, the transaction likely will have the following effects in mobile
    wireless telecommunications services in the relevant geographic markets,
    among others:*

    *a.*       *actual and potential competition between AT&T and T-Mobile will be
            eliminated;*

    *b.*       *competition in general likely will be lessened substantially;*

    *c.*       *prices are likely to be higher than they otherwise would;*

       d.      *the quality and quantity of services are likely to be less than they otherwise would due to reduced incentives to invest in capacity and technology improvements; and*

       e.      *innovation and product variety likely will be reduced.*

**Response**:      Defendants deny the allegations in this paragraph.

## VI.    REQUESTED RELIEF

*The Plaintiffs request:*

49. *That AT&T's proposed acquisition of T-Mobile be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;*

50. *That Defendants be permanently enjoined from and restrained from carrying out the Stock Purchase Agreement dated March 20, 2011, or from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to bring the telecommunications businesses of AT&T and T-Mobile under common ownership or control;*

51. *That Plaintiffs be awarded their costs of this action;*

52. *That Plaintiff States be awarded their reasonable attorneys' fees; and*

53. *That Plaintiffs have such other relief as the Court may deem just and proper.*

**Response**:      Defendants deny that Plaintiffs are entitled to any of the relief requested, and request that Defendants be awarded the costs incurred in defending this action, and any and all other relief as the Court may deem just and proper.

## DEFENDANTS' AFFIRMATIVE DEFENSES

Defendants assert the following defenses, without assuming the burden of proof on such defenses that would otherwise rest with Plaintiffs:

1.      Granting the relief sought is contrary to the public interest.

2.      Without prejudice to Defendants' response to Paragraph 46, the expansion of capacity and other overwhelming efficiencies that will result from this transaction will benefit consumers, such that the transaction is in the public interest.

Dated:  September 23, 2011

Respectfully submitted,


*/s/ Mark C. Hansen*
Mark C. Hansen, D.C. Bar # 425930
Michael K. Kellogg, D.C. Bar # 372049
Kellogg, Huber, Hansen, Todd,
    Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

Richard L. Rosen, D.C. Bar # 307231
Donna E. Patterson, D.C. Bar # 358701
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206
(202) 942-5000

Wm. Randolph Smith, D.C. Bar # 356402
Kathryn D. Kirmayer, D.C. Bar # 424699
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500

*Counsel for AT&T Inc.*


George S. Cary, D.C. Bar # 285411
Mark W. Nelson, D.C. Bar # 442461
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500

Richard G. Parker, D.C. Bar # 327544
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

*Counsel for T-Mobile USA, Inc. and*
    *Deutsche Telekom AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2011, I caused the foregoing Answer to Plaintiffs'

Amended Complaint to be filed using the Court's CM/ECF system, which will send e-mail

notification of such filings to counsel of record.  This document is available for viewing and

downloading on the CM/ECF system.

*/s/ Mark C. Hansen*
Mark C. Hansen